JUDGE TUCKER
declared himself satisfied with the opinion to be delivered by the President, which perfectly accorded with his ideas on the points in this cause.
JUDGE ROANE.
About the year 1768 and 1769, Doctor Thomas Walker, who had a large tract of vacant land in the County of Washington, and wished to sell it out to settlers, published his price and terms therefor, in advertisements stuck up at two or three places in the Western Country. In consequence of these proposals, many persons went out and actually settled on the lands; and among *others, James Piper, Joseph Black, Christopher Acklin, Josias Gamble, Alexander Breckenridge, and John Campbell, (who have all given depositions in this cause,) and John Huston, under whom the appellant claims. One of these advertisements was seen by Gamble, at Inglis’s ferry, which also John Campbell thinks he saw; but none of them are exhibited in the cause; and John Campbell, who professes to have a general acquaintance in the Western Country thinks that none of them are now in existence. It is not strange that this should be the case; for they were perhaps only in writing, and not printed, and being intended for general information, it would have been improper for any particular settler to have taken them down, and appropriated them to his own individual use: they', however, as we are told by John Campbell, had produced a general opinion and belief, that the lands in question were sold at 111. per hundred acres. As, however, the act of frauds was not then in force, (nor in 1778, when a recognition of the terms of this proposal was made by Dr, Walker to the appellant,) we are at liberty to give evidence of their contents. It is agreed on all hands that these proposals stated that the lands in question, the Wolfhill tract, were to be sold at 111. per hundred acres; which, also, Dr. Walker told John Campbell was the price, in the summer of 1769; and Josias Gamble says there was no limited time for the payment of the money, but that the settlers were at liberty to pay interest as long as they pleased, commencing one year after their settlement. While the settlers were in some cases compellable to take more land than they wished, for they were to adjoin the lines of the neighbouring tracts, and leave no vacant spaces between. [See the depositions of Breckenridge and John Campbell.] It is not shewn or pretended that they were restricted in the quantity they were at liberty to procure. Indeed, when we consider that persons of that description, who alone were invited to purchase, were not in a condition to monopolize large quantities of land, there was no necessity for such a restriction on the part of Dr. Walker: and besides, as there was a large quantity of other *lands at market in that Country at the same time, the interest of the proprietor would not have induced him to establish such a condition: he undoubtedly wished to sell as much of his own lands as he could. There is therefore not only no restriction in relation to quantity proved to have existed ; but on the contrary, it is highly improbable that any such should have been contemplated: on the other hand, James Piper proves that it was understood that the proposals permitted settlers to acquire “as much land as they wanted.”
Under these proposals thus unrestrained in this particular, John Huston made a settlement and improvement on the land in controversy. Christopher Acklin proves that Huston claimed and sold to Vance more land than Vance ultimately got, (that is, more than 300 acres,) and that he (Huston) claimed up to his (Acklin’s) lines, and to certain lines to the north and west. This testimony I understand to go to 1 his; that Huston’s claim was commensurate with the whole tract since conveyed to Vance by Francis Walker. Such was the extent of Huston’s claim which he sold to Vance, and consequently such was the extent of Vance’s claim; and it is proved by Black, that in 1778, Vance having paid Dr. Walker for 300 acres, it was understood and agreed that he should have the balance of the land he then claimed under Huston, (that is, the land now in controversy,) at the same price of 111. per hundred acres.
This then is a solemn recognition and continuation of the right derived from Huston, as to the land in question. It is besides corroborated and supported by the following circumstances: 1st. Dr. Walker told Crow at the same time, (that is, in April, 1778,) that he sold his land on the Wolfhill tract at 111. per hundred acres, payable in horses or cattle at the old prices; and 2dly. Huston (and under him the appellant) and Acklin always considered that their lands adjoined; a line was run, by arbitration, between them after Vance purchased ; and Vance cleared the land in so many places that it is proved that a 300 acre survey, would not comprehend all the improvements. [See Conn’s and *Deckart’s depositions.] It is not credible that Huston and Vance would have done this except under a belief that their title to the whole land could be sustained. When we add to this the evidence in the cause that the lines of adjacent settlers were to join, and leave no vacant spaces between, it is clear that both by the original contract between Dr. Walker and Huston, and by that proved by Black to have taken place in 1778, Vance was entitled to the whole land now in controversy.
Considerable aid is derived to this idea from the terms of the entry in Dr. Walker’s books stated in the answer. That answer states that Vance “was charged in the books of Dr. Walker with 300 acres of land sold him,” and “is credited with 401. in *672 part of principal and interest due for the same.” Now, when it is recollected that it is proved that 300 acres were fully paid for, this expression “in part” amounts to an admission that it was supposed or admitted that there were other lands to which the appellant was entitled; and which were not paid for: the number of 300 acres was charged undoubtedlj', because, and only because, that quantity was known and admitted to be in the tract, and there was no other specific number by which Walker could charge it with certainty on his books.
It remains next to inquire whether the appellant has waived or forfeited this right thus clearly established, or not.. I will inquire, 1st. Whether this is done by reason of the lapse of time; and 2dly. Whether the settlement with Francis Walker, when Vance got his deed and gave the bonds now enjoined, operated such a waiver.
As to the first, it is proved that settlers were to pay interest as long as they pleased; [See Gamble’s deposition;] and it is proved by Breckenridge that they were to pay interest till the whole was paid, when the conveyances would be executed. The settler was in the enjoyment of the land, and Walker was to receive interest on his money: it was in Walker’s power to accelerate the final payment by surveying the land, and making conveyances; and this perhaps was not in the power of the settlers. It is in proof that he *had surveyors for that purpose residing in that country; and it was their laches that the surveys were not made, and the business completed. As to injury from length of time, it would have operated to the prejudice of Vance, but not at all of Walker; for if Black, in the present instance, had died, he would have lost his testimony, and with it this cause, whereas Walker stood firm on the ground of his patent, and could sustain no injury as it related to the claim of the land. It is probable therefore, if not clear, that those delays, which too, by being general, exempt Vance from any suspicion of culpability, arose from the neglect of the agents of Walker, or from their inability to survey so many tracts in a shorter time; and that the settlers were undoubtedly desirous to close their titles and get conveyances for lands, which the progress of events in that country had rendered it so important for them to acquire on such cheap terms. I cannot believe therefore that delay was wished or caused by any settler.
Secondly, did Vance waive his right to this land by giving the bond and receiving the deed from Francis Walker? The answer of Francis Walker says that Vance, so far from attempting to establish his claim for more than 300 acres, regretted that he had not “purchased more from Dr. Walker, at 111. per hundred. As to Vance’s not attempting to establish this claim, this might well be, because Francis Walker had come suddenly into the country, and his witness was not present: but he certainly mentioned his claim, and complained that it was not allowed. [See the depositions of James Vance and Specker.] Being thus unprepared at the time, it would have been vain to have attempted to establish his claim, and would only have tended to irritate Francis Walker, and perhaps prevent him from letting Vance have the land. It is in proof that it was understood that Capt. White stood by, ready to purchase the land from Walker, and that Walker threatened to sell Acklin’s land, if he did not comply with his terms. As to Vance’s regretting he had not purchased more land at 111. the testimony of James Vance and Specker shew that Francis *Walker is mistaken; unless we understand “purchase” here to mean paying for the land, and purchasing it so effectually as to put an end to the controversy. If we regard those depositions, and yet believe the answer, we must understand it in this qualified sense; for both these witnesses say that Vance in conversation with Francis Walker relied on his purchase from Dr. Walker; and Specker says that Vance told him “if he had paid Dr. Walker a trifle more, he would have got his deed, and that' he could prove his purchase by some one in Frenchbroad. ” These two witnesses therefore taken in connection with the other circumstances in the cause, outweigh the answer in this particular, unless it be taken in the sense in which I have endeavoured to explain it.
But Vance was induced by the declarations of Francis Walker to forbear to press his claim (now in question) at the time of giving his bonds. He declared publicly that any person who could thereafter establish contracts with his father should have the benefit of them, and even called witnesses to attest this declaration. Nothing could be more just than this declaration, or more convenient for a party acting with a numerous body of men standing on a common foundation, than to act by general rules and declarations; particular communications with every individual being unnecessary and inconvenient in such cases. Francis Walker was as much at liberty to annex a condition to the settlements in question by such general declarations as those now proved, as his father was to contract, by means of his general advertisements aforesaid, with settlers whom he had never seen, and with whom he had no particular communication. Francis Walker in particular is estopped from making the objection ; for he tells us in his answer that he invited all who had claims to bring them in, and declared that he was ready to grant conveyances to all who were authorised to receive them. After thus adopting this general mode of acting with these people, it does not lie in his mouth to make the present objection. These declarations induced, or may have induced, Vance and others to suspend, or forbear *to-press their claims at that time; to wait till they were more ready for the purpose; and in the mean time, to get their deeds; and it would be highly unjust to permit Francis Walker to withdraw himself from the effects produced thereby: such permission would sanction and produce the highest iniquity and injustice. As to Vance, there is no iota of testimony shewing that he ever waived or gave up this claim to the land in question. On the other hand, the general declarations above *673 mentioned amounted to an agreement on the part of Walker that the settlements which then took place should not be final, if contracts with his father could thereafter be established; in other words, if equity and justice forbade that they should be final.
X am for holding Walker to his oiler: I will not agree that Vance should thus be taken in; and am of opinion now to establish that contract, which, independently of the transactions of that day, is proved beyond possibility of contradiction, and was not on that day abandoned.
It is said that the contract with Dr. Walker charged in the bill is not admitted by the answer. True; but neither is it denied. It could not be admitted or denied, as it did not rest within the knowledge of Francis Walker; but it is proved by the testimony. Again, it is said that the agreement charged on Francis Walker at the time of the settlement is denied by him, and not proved. I admit it is denied and not proved, taken in a particular view, as being made, or not, to Vance himself: but it is not denied, and is proved to have been made in general, and thus made to Vance himself under the doctrine I have now contended for.
As to the application of the act of frauds in this case, both the contracts on which the appellant relies were anterior to its existence. Besides, the contracts were in part performed, and therefore would meet the provisions of the statute had it been in force and relied on. The bonds and deed now in question, it is true, were posterior to the ^enaction of the statute; but they do not form the contract which the appellant seeks to avail himself of; but only the consummation of it. If it be said that a reliance on the parol proofs in this case is dangerous, I answer that the act of frauds does not apply to the two points of time embraced by them, and that it was not for Courts but the legislature to adopt the rules of that statute. Independent of it, we must decide this case, as others, by the general doctrines of evidence. The parol testimony in this case of what passed at the time of giving the deed is not received to shew what the contract for the land was; but to shew a collateral matter, i. e. that the settlement as to the price was not intended to be final. It may be said that it is desirable to settle controversies and put an end to litigation: while this is agreed to, it is perhaps more expedient that right and justice should take place. As to the doctrine of confirmation or waiver, there can be none unless it appear, either expressly, or by plain and necessary implication, that the party, with a full knowledge of his rights, and under a perfect freedom as to his course of proceeding, had waived them. In the case before us, the appellant had such strong inducements to get his deed, and ran such risks of losing his land by a course of opposition, that he stands excused from insisting on his right at that time, even if he had been certain of being thereafter able to establish it. I see nothing in this case on the point of waiver which does not apply to cases in general; and it is too much to say that the giving bond and taking a conveyance shuts out all equitable claims or discounts in all cases whatsoever. On the contrary, as I have already said, the appellee himself has repeatedly disclaimed the character of a final and irrevocable settlement as applicable to the transaction in question; and we ought to permit him to construe his own proceedings.
The right of the appellant to the land in question, therefore, not having been abandoned through lapse of time, (the delay in this case being well accounted for,) nor waived at the time of the settlement, or at any other time, either expressly, or by necessary implication, I am of opin-307 ion to reverse *the decree, and let the appellant have the benefit of his purchase, at the rate of 111. per hundred acres, with interest, &c.
JUDGE FEEMING.
The bill charges, that the complainant had agreed with Dr. Walker, for all the land within certain bounds at 111. per hundred acres, supposed to contain about 300 acres, for which he paid him: the remainder, if any, to be ascertained by survey, which was not done in Dr. Walker’s life-time. That about the year 1800, Francis Walker had the land surveyed, which was found to be 773 acres,) and demanded twenty shillings per acre for the surplus of 473 acres. And being intimidated by threats of the said Francis Walker, and fearing he would take away his valuable improvements, he consented to give twenty shillings per acre, and executed two bonds for the amount. But it was expressly agreed between Walker and himself, that, if he could thereafter prove any agreement or contract with Dr. Walker, the complainant should have the benefit thereof.
The defendant in his answer, says that he was ready and willing to make, and did make, deeds to all who called on him properly authorised to demand a conveyance, and was ready and willing to make a conveyance to Vance for all, and any lands to which he had a claim, under a contract with Dr. Walker, and made a conveyance to him of 300 acres, in consequence of the contract, which it appeared his testator had made with the said Vance, and also of 473 acres more, which Vance purchased of him, and for which he executed the bonds in the bill mentioned. That on Dr. Walker’s books, Vance is charged with 300 acres sold him, and is credited with 401. in part of the principal and interest due for the same. That the defendant offered to lay off the lands of said Vance to which he was entitled, in such manner as he should direct, and so as to include the improvements thereon. The defendant never used any threats or menaces to induce the complainant to execute the bonds, but was willing and ready to make him a right to *all the lands to which the semblance of a claim appeared to exist in him. That Vance did not, and as the defendant believes, could not, shew even a title to the 300 acres, which defendant was willing to convey to him in consequence of the entry made in his testator’s books; much less to any other portion of the lands to which he now pretends to set up a title. That the contract for the 473 acres was a fair, just and honest contract, made with a view to accommodate Vance, in many respects; *674 particularly as the defendant sold the land to him for less than he could have gotten from other purchasers. That Vance, so far from pretending to establish a claim for more than 300 acres, expressed his regret that he had not purchased the whole of Dr. Walker, as he might then have gotten them for 111. per hundred acres.
Thus the principal charges in the will are expressly denied by the defendant’s answer, and I consider the execution of the deed of conveyance by Walker, and the acceptance of it by Vance, and his executing bonds, for payment of the purchase-money, in the year 1800, long after the statute of frauds, as an adjustment of the business, and a consummation of their contract, and completelj' binding between the parties: and not to be shaken or disturbed by oral testimony ; especially that of witnesses, who appear to me to be interested, having disputes themselves of a similar nature with the defendant, and a strong bias on their minds in favour of the complainant; and speaking of loose conversations about the time of executing the contra,ct. The admission of such evidence, on this occasion, would, in my conception, be opening a wide door to the very mischiefs contemplated, and so wisely guarded against, in our act to prevent frauds and perjuries.
Had the parties not considered the business as finally closed at the time of executing the contract, how easy would it have been to have made a short memorandum in writing on the back of each bond, expressive of any future expectation or intention ot the parties; or a note or memorandum in writing on a separate paper signed by Walker, *to that effect; neither of which having been done, I am of opinion that the decree is correct, and ought to be affirmed, which is the opinion of a majority of the Court.
The following was entered as the decree of the Court.
‘ ‘A majority of the Court is of opinion, that an agreement, concerning the purchase of lands, perfected by the execution of a convej'ance on the part of the seller, and by the acceptance thereof, and the payment of the purchase-money, or execution of a bond or bonds for the same, on the part of the purchaser, is final and conclusive, between the parties and their heirs, in law; and ought not to be disturbed in equity, unless fraud, or some manifest mistake in such conveyance, or bond, be shewn and proved; or unless some note or memorandum in writing be made, pursuant to the statute of frauds and perjuries, (if subsequent to that statute,) at the time, or after the execution, of such conveyance or bond, whereby it may appear that the parties had agreed to some further explanation or modification of the terms of agreement as therein expressed. Upon these grounds, the Court is of opinion that the said decree is right,” &c. Decree affirmed.